**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Mark Shallal, et al., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-cv-2154 (RCL) |
| | ) | |
| Robert Gates, et al., | ) | |
| | ) | |
| Defendants | ) | |

**Plaintiff's Memorandum in Opposition to Federal Defendants' Motion to Dismiss**

## INTRODUCTION

The motion to dismiss must be denied, because of a profound factual dispute between the government's affidavit from Central Command and plaintiff's exhibit from the Defense Security Service.  DSS says that as of May 9, 2006, Shallal's final security clearance application is in the process of being investigated, while the affidavit says no one named Mark Shallal has ever made a security application and no one has ever submitted an application on his behalf.  **Plaintiff asks the court to convert the motion to dismiss into a motion for summary judgment and deny the motion based upon an incredibly critical factual dispute going to the heart of the case.**

Plaintiff, an exceptionally gifted Arabic language translator opposes the government's motion to dismiss, because his entire career hangs in the balance.  At a time of war, the nation has an acute shortage of Arabic language translators, and desperately needs individuals such as Shallal who are particularly skilled in the Iraqi dialect.  Yet, the government continues to attempt to deny him any due process whatsoever.  For years, plaintiff has been caught in a Kafkaesque bureaucratic vortex

stopping him from gaining employment in his chosen career.   Denial of hearing on his request for a security clearance is tantamount to depriving him of his chosen career. Motivated by patriotism Shallal desires a career in national security, intelligence, or military translation.   Plaintiff launched an exhaustive job search, but he has been told he cannot obtain a clearance with the government or a private contractor.  Yet, for reasons completely unrelated to his suitability for a security clearance, he is not able get a hearing on a clearance application.   Shallal strongly desire a hearing, because he is unequivocally confident a hearing would award him a clearance.   Shallal asks this court to deny the government's motion to dismiss and require the government to honor his right to due process.

## STATEMENT OF FACTS

Prior to summarizing, plaintiff must raise an extremely important issue with the court.   There is a tremendous important factual dispute between the government affidavit and a voluminous amount of documents in Shallal's possession.

Due to time constraints, it was not possible to scan in the well over 100 pages of documents regarding Shallal's clearance.    Instead, plaintiff attaches Exhibit #1; a letter from the Defense Security Service to Shallal dated May 9, 2006.   The contents of the letter are explained below, but suffice it is say that DSS states it is working on a final clearance investigation and will complete its investigation "as soon as possible".

The government's affidavit states that Central Command cannot find any record of a security clearance application for Mark Shallal.    The government argues courts can take judicial notice of public records without converting a motion to dismiss into a motion for summary judgment; however, the affidavit is not a public record.    There is

no print out from a computer, but instead one person's word that he cannot locate it. The fact that he cannot locate it does not mean the application does not exist.   The affidavit arrives from Central Command; however, the affidavit does not say all applications for personnel going into Iraq go through Central Command.   Central Command most assuredly does not adjudicate clearances.

Either the affiant is lying, he simply cannot find the application, or the affidavit contains an extremely obscure difficult to discern passage making the affidavit merely misleading.   The affidavit references a two year from termination or 15 year period. However, one cannot determine the meaning of these phrases.   Perhaps, he means that no records are available more than two years after the employee is terminated.    If so, this would not be surprising considering that Titan terminated Shallal in 2003.   When one says no record of a clearance application can be found, the individual attempting to locate information can narrow the search in such a way that the individual looking knows they will not find anything.   This is what appears to have happened in this case.

Mark Shallal is a Chaldean Christian born in Iraq, who came to the United States fleeing the oppression of the Saddam Hussein regime.   Prior to the 2003 war against Iraq, Shallal became a permanent U.S. resident and later became a U.S. citizen.   He became an extremely proficient translator of the Iraqi dialect of Arabic as well as other languages.   The vast majority of job opening in this field are with the government or with government contractors, and translator jobs with government contractors pay a great deal more than other private sector translator jobs.

Titan hired him to serve as a translator between U.S. forces and the Kuwaiti military.   Shallal filled out a security clearance application, but he does not know what

became of the application, because he has heard a great many differing stories about the status of his clearance application.   The complaint states that Titan ordered Shallal to complete the application immediately and would not give any of its employees sufficient time to finish the applications.   The company told employees that the interim clearance applications would be immediately sent to the government.   Government regulations provide that interim clearances will be given within five days of receipt.

Upon arrival in Kuwait, Titan gave Titan an entirely new job as a covert agent and told him he would be one member of a team going to Basara Iraq.   The government stated the team would move out prior to the commencement of hostilities.   The team was to clandestinely meet with religious and community leaders in Basara and inspire and help them launch a rebellion in Basara.   Basara is a large city, and a successful rebellion would prevent casualties caused by house to house fighting.  The type of mission required an extremely high level clearance, and he had only applied for a secret clearance.   At that time, Shallal was still an Iraqi citizen, government regulations prohibited the government from giving him anything higher than a secret clearance. Shallal had been led to believe he would have an interim secret clearance prior to arrival in Kuwait.   After landing, he learned the application had still not been submitted.   For many days, Shallal asked Titan to submit his interim clearance application, but the company declined.   Therefore, Shallal worked undercover for many weeks in Kuwait without any clearance.   His Titan manager became annoyed that Shallal regularly asked about his clearance, and he did not appreciate Shallal's reluctance to go on an undercover operation without a clearance.   Titan terminated Shallal, and he returned to Michigan.

According to some government officials, Titan placed a block or hold on his clearance application.   Shallal applied for dozens of jobs with government contractors and the United States government, but he was always told the company could not hire him, because Titan placed a hold on his application.   No one has been given him a meaningful definition of the word "block" as it applies to his clearance.   Based upon the context though, the government maintains a database of clearance applications.   The database for government employees and employees of government contractors are supposed to be separate, and there may also be separate databases for different federal agencies.   Numerous individuals have told Shallal that a large defense contractor such as Titan has the ability to enter data that will preclude the individual from obtaining employment with other companies until Titan lifts its "block".   However, the database is owned, maintained, and controlled by the United States government.

To extent Titan has provided Shallal any explanation about his clearance, the company blamed the government.   Government employees have either told Shallal to be patient, blame other government officials, or blamed Titan.   Shallal brought this action in part hoping to learn why he cannot obtain any employment in his career of choice.

The government attaches an affidavit attesting to the fact that the Defense Security Service never received any application for Shallal.   However, the government previously told him his application was pending and would be completed shortly. One of the many varying tales came in a May 9, 2006 letter from the Defense Security Service [Affidavit 1]:

> Reference your letter received May 8, 2006 wherein you requested the reason that your interim eligibility was withdrawn.  Due to information developed during the course of the investigation, your eligibility was withdrawn.   Please be assured that a final eligibility determination will

be made as quickly as possible after your investigation is completed
and your Facility Security Officer will be notified accordingly.   We
suggest that you keep in contact with your FSO and address any
questions or concerns you may have regarding your application to that
office.

The affidavit before the court and the letter of May 9 from the Defense Security Service

cannot be reconciled.

Because federal agencies and government contractors told Shallal Titan was

preventing them from hiring him, Shallal had to apply for a job that did not require a

clearance.   Jobs not requiring a clearance are most rare.   Jobs not requiring a clearance

pay vastly less than jobs requiring a clearance.   In order to progress past the first rung of

the career ladder, the employee must have a clearance.    Moving up the career ladder,

jobs become more interesting, challenging, and intellectually stimulating.   Shallal

accompanied U.S. troops on patrols in Iraq.    Although this is the most dangerous type of

assignment, this position does not require a clearance.   Shallal sustained a job related

injury, was terminated, and returned to the United States.   Shallal has been almost

completely unable to find any employment in his career of choice.    Any future

employment Shallal might receive is not within his career field, dangerous, and has no

potential for advancement.

**Legal Standard for Rule 12 (b) Motions**

Plaintiff's claim against the government defendants should not be dismissed,

because the facts alleged are sufficient to prove deprivations of substantive and

procedural due process.

The Supreme Court most recently address the legal standard governing Rule 12

(b) motions in Bell Atlantic v. Twombly, 127 S. Ct. 1955, 1059 (2007).   The court held:

> While a complaint at-tacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true. Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.

The court overturned one sentenced contained in <u>Gibson v. Connelly</u> wherein the court stated that a claim could not be dismissed unless plaintiff could prove "no set of facts entitling him to relief":

> On such a focused and literal reading of *Conley*'s "no set of facts," a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some "set of [undisclosed] facts" to support recovery. <u>Id.</u> at 1968.

While the facts alleged and inferences therefrom are assumed to be true, legal conclusions or speculation is not sufficient.

Other portions of <u>Gibson</u> remain good law.   A complaint must contain only "A short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the … claim is and the grounds upon which it rests," <u>Conley v. Gibson</u>, 355 U. S. 41, 47 (1957) .   In ruling on a motion to dismiss, the court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in favor of the plaintiff. <u>Maljack Prods. v. Motion Picture Ass'n</u>, 52 F.3d 373, 375 (D.C. Cir. 1995); <u>Hishon v. King & Spalding,</u> 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984). All factual doubts must be resolved and all inferences

made in favor of the plaintiff. <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).

The law is settled that judgment on the pleadings (or a motion to dismiss under Rule 12(b)(6)) is not appropriate where the answer raises issues of fact which, if proved, would defeat recovery. For the purposes of such a motion, all allegations of the opposing party's pleadings are taken as true and all allegations of the moving party which have been denied are taken as false. <u>Franklin Nat'l Bank v. Krakow</u>, 295 F. Supp. 910 citing 2A Moore's Federal Practice P12.15 (1968 ed.).

A trial court will not grant a motion for judgment on the pleadings merely because the court doubts plaintiff's ability to prove the allegations of the complaint at trial. <u>Haynesworth  v. Miller</u>, 261 U.S. App. D.C. 66, 820 F.2d 1245, 1254 & n. 73 (D.C. Cir. 1987). When a federal court reviews the sufficiency of a complaint, [t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 94 S.Ct. 1683, (1974). ("Rule 12(b)(6) does not countenance … dismissals based on a judge's disbelief of a complaint's factual allegations….a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").   Id at 246.

The facts alleged by Shallal are very specific

## 4.  Argument

The plaintiff argues the government has violated his Fifth Amendment rights to both substantive and procedural due process.

Substantive due process includes the fundamental right to pursue a chosen lawful career.   Actions taken by the government and Titan permanently preclude him from ever

obtaining a security clearance and thereby prohibit him from pursuing his desired career either as a government employee or as an employee of a government contractor.

Procedural due process guarantees employees of government contractors notice and an opportunity to be heard prior to adjudicating the employee's security clearance; however, the present system does not give the employee any notice or any opportunity to be heard.   Instead, the government gives the contractor notice and the contractor an opportunity to be heard.

## 4A.  Procedural Due Process

Mark Shallal has not yet received any due process and absent court intervention almost certainly will never receive any due process.   Shallal has not received any notice about any proposed decision or allegations, the government in fact declines to provide any rationale for delaying his clearance, and Shallal has had no opportunity whatsoever to challenge unknown allegations.   The question presented is therefore whether an employee has any due process rights.

In Greene v. McElroy, the Supreme Court ruled an employee of a defense contract has property interest in their current job and a liberty in pursuing their chosen profession, and as a result, the employee was entitled to a "full hearing" determining whether he deserved a security clearance. 360 U.S. 474 (1959).

The court wrote:

> Respondents admit, as they must, that the revocation of security clearance caused petitioner to lose his job with ERCO and has seriously affected, if not destroyed, his ability to obtain employment in the aeronautics field. Although the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the "liberty" and "property"

concepts of the Fifth Amendment, Dent v. West Virginia, 129 U.S. 114; Schware v. Board of Bar Examiners, 353 U.S. 232; Peters v. Hobby, 349 U.S. 331, 352 (concurring opinion); cf. Slochower v. Board of Education, ; Truax v. Raich, 239 U.S. 33, 41; Allgeyer v. Louisiana, 165 U.S. 578, 589-590; Powell v. Pennsylvania, 127 U.S. 678, 684, respondents contend that the admitted interferences which have occurred are indirect by-products of necessary governmental action to protect the integrity of secret information and hence are not unreasonable and do not constitute deprivations within the meaning of the Amendment.

Greene at 492.


The court considered a Department of Defense regulating granting employees of contractors a hearing and found the regulations defective, because they failed to give the employee the right to confront accusers and cross-examine witnesses. Id. at 505

The current system of processing clearances does not conform with Greene v. McElroy, because employees have no due process rights whatsoever.    Instead, the regulations give all procedural safeguards to the contractor.    See: https://www.dss.mil/portal/ShowBinary/BEA%20Repository/new_dss_internet/psco/indu s_psc_eligibility.html.   The Defense Security Service regulations provide that notice of security clearance denials are sent to contractor and are not sent to the employee.   Upon completion of the required investigation, a final security clearance determination will be made as quickly as possible and the FSO will be notified accordingly." The contractor is not required to tell the employee his clearance has been revoked.   Instead, the contractor has complete discretion to give the employee a false reason or no reason at all.    The contractor receives a description of the reasons for a denial and the right to request a hearing.   Not only does the employee not receive any information about the clearance denial, the DSS web page cited above "DSS does not respond to oral inquiries from

applicants regarding why their interim clearance was denied…. Security clearance

applicants should address any questions or concerns regarding a security clearance

application or processing to their FSO."   Shallal sent the Defense Security Service a

letter asking for the reasons his clearance application has been delayed.   The DSS letter

pointedly declined to provide any answer and instead merely referred to the letter they

sent Shallal.    However, DSS did promise him that his final clearance approval was still

pending and would be adjudicated "as soon as possible".  [Attachment 1].   It has been

almost two years since the DSS gave the promise on May 9, 2006.

The present system of security clearance adjudications gives employees no notice,

no opportunity to be heard, does not begin to comply with Greene v. McElroy, and

therefore violates plaintiff's right to due process guaranteed by the Fifth Amendment to

the United States Constitution.

**4B.  Rule 12 (b) Applied to Due Process Claim**

A 12 (b) motion asks the court to dismiss, because plaintiff has no claim upon which

relief can be granted.   Although plaintiff may not be entitled to all the relief requested,

his case cannot be dismissed so long as he is entitled to some relief.   When addressing

claims involving security clearances, federal courts tread lightly, because granting certain

types of relief could violate separation of powers.   Yet, courts consistently draw a

distinction between providing employees procedural rights and reaching the merits of a

clearance determination.   In this case, plaintiff is not seeking a de novo review of the

11

facts going to the merits of his entitlement for a security clearance.  The case sited by

defendant, Egan v. Department of Navy, 484 U.S. 518 (1987), is not distinguishable; it

has no inapplicability at no.   Egan dealt with a federal employee's attempt to challenge

the wisdom of a security clearance denial.   The court went to great lengths to catalogue

the extensive due process given to Egan.   The opinion states that the "substance" of a

clearance determination is not reviewable by the Merit Systems Protection Board.

Instead, he seeks the government to adjudicate a security clearance application, because

he is quite confident he would be awarded a clearance if the government ever granted

him a hearing.   In the context of a 12 (b) motion, the court must consider not whether

plaintiff is entitled to a clearance, but instead whether he can prove any set of facts

entitling him to any relief such as a declaratory judgment stating that government denied

him due process by failing to provide him a hearing.    Since there can be no doubt

plaintiff is entitled to some relief, the motion to dismiss must be denied.

**4C.   Public Policy Favors Allowing Agencies to Hire the Best Qualified Employees**

        Public policy strongly opposes granting the government's motion to dismiss.

The public interest dictates that federal agencies and government contractors should be

permitted to hire the best qualified candidates.   Currently, a government contractor may

place a hold on a former employee by entering information into a government database.

Neither the employers who believe information supplied by the former employer is

irrelevant or incorrect, nor or the employee has a mechanism to correct the record.   As

the complaint recites, numerous private and government employers made job offers

conditioned solely on an ability to obtain a clearance.   Information about past clearance

applications prevented these employers from hiring him.

In weighing the public interest, the court must keep in mind that plaintiff has never received a hearing on any clearance.   We are not dealing with an individual who actually poses any security risk.   Instead, the court considers a case brought by an individual who is utterly convinced he would be awarded a clearance if the government ever reached the merits.  Government agencies have an intense need for reputable Arabic linguists, and there are currently an insufficient number of such individuals to meet the government's requirements.   The public interest dictates employers should not be prevented from hiring reliable highly skilled Arabic translators.   Security clearance determinations are an inherently governmental function.    However, the current system privatizes the clearance process.    Public policy dictates that a private sector company should not be able to stop a federal agency from hiring candidates.   Therefore, the public interest weighs in favor of giving Shallal a hearing or some other method to lift Titan's hold on his ability to obtain future employment.


**4D.   Substantive Due Process**

The government security clearance database precludes Shallal from obtaining any government job requiring a security clearance.   Shallal seeks a career in the areas of homeland security, national intelligence, and Arabic translations.   All or virtually all of the career opportunities in these career fields involve working for the United States government or a government contractor.   Barring Shallal for being considered for a security clearance violates plaintiff's fundamental substantive due process right to pursue his vocation.

Substantive due process embraces those rights implicit in the "concept of ordered liberty" because the right has been recognized throughout American history or "deeply rooted" in American society.   Since the Magna Carta, courts have consistently recognized an individual's right to earn a livelihood in the vocation of their choice.

The Court usually looks first to see if there is a fundamental right, by examining if the right can be found deeply rooted in the history and traditions of the United States. If the right is not a fundamental right the court applies a rational basis test; if the violation of the right can be rationally related to a legitimate government purpose, then the law is held valid. Once the court has established that the right being violated is a fundamental right, the court inquires into whether there is a substantial state interest being furthered by the violation of the right, and whether the law in question is narrowly tailored to address the state interest.

The Supreme Court classifies the individual's right to pursue a lawful occupation as a fundamental right.   In Toomer v. Witsell, the Court held "that commercial shrimping in the marginal sea, like other common callings, is within the purview of the privileges and immunities clause." 334 U.S. 385, 403 (1948).   As recently as 1999 the Supreme Court held that the Fourteenth Amendment protects the right to "choose one's field of private employment ... subject to reasonable government regulation."  Conn v. Gabbert, 526 U.S. 286, 292 (1999).  But the Court upheld the regulation in that case. Likewise, in United Bldg. and Const. Trades Council of Camden County and Vicinity v. Mayor and Council, the Court wrote:

> Certainly, the pursuit of a common calling is one of the most fundamental of those privileges protected by the [Privileges and Immunities] Clause [of Article IV]. Many, if not most, of our cases

> expounding the Privileges and Immunities Clause have dealt with this basic and essential activity. Public employment, however, is qualitatively different from employment in the private sector; it is a subspecies of the broader opportunity to pursue a common calling.

465 U.S. 208, 219 (1984)

As early as 1915, the United States Supreme Court declared that "the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of [the Fourteenth] Amendment to secure." Truax v. Raich, 239 U.S. 33, 41 (1915). Limitations on this right may be sustained only after the most careful scrutiny. (Purdy & Fitzpatrick v. State of California, 71 Cal. 2d 566, 579; cf. Allgeyer v. Louisiana (1897) 165 U.S. 578, 589-590 [41 L.Ed. 832, 835-836, 17 S.Ct. 427]; Truax v. Raich, supra, 239 U.S. 33, 41; Endler v. Schutzbank (1968) 68 Cal. 2d 162, 169, fn. 4, 169-170 [65 Cal. Rptr. 297, 436 P.2d 297]; Blumenthal v. Board of Medical Examiners (1962) 57 Cal.2d 228, 235 [18 Cal. Rptr. 501, 368 P.2d 101].) Bartending and related jobs, though carefully regulated, are lawful occupations and the strict standard of review is therefore justified on this ground.

In Lowe v. SEC, 472 U.S. 181 (1985), the Court struck down an injunction which had been secured by the Securities and Exchange Commission against a group of former investment advisors. These advisors had lost their SEC licenses, and thus could no longer offer professional investment advice. Instead they began to publish a newsletter expressing their opinions on stock market investments. The SEC enjoined them, on the grounds that the loss of their licenses prohibited them from this profession. The investors responded that their right to publish was protected by the First Amendment, and the Court agreed. Id. at 228.

This issue involves a collision between the power of government to license and regulate those who would pursue a profession or vocation and the rights of freedom of speech and of the press guaranteed by the First Amendment. The Court determined long ago that although '[it] is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, . . . there is no arbitrary deprivation of such right where its exercise is not permitted because of a failure to comply with conditions imposed . . . for the protection of society.' Regulations on entry into a profession, as a general matter, are constitutional if they 'have a rational connection with the applicant's fitness or capacity to practice' the profession**.**

The government must give individuals notice and an opportunity to be heard before excluding them from a broad range of careers.   Government security clearances procedures impose devastating consequences on two separate groups of individuals.

First, under the United States government's personnel and government contracting system, a government contractor has unfettered discretion to prevent formers employees from being hired by any other government contractor or the federal government.

There are a finite number of Arabic language translators in the United States economy and only a small segment of those translators speak the native Iraqi dialect. Various Arabic dialects differ so widely that individuals from North Africa are virtually unable to communicate with Iraqi speakers.   Therefore, it is critical for the government to have native Iraqi speakers.   Government contractors engage in a competition simply to find a sufficient number of linguists to fill positions, and future government contracting opportunities hinge on a company's current ability to provide a sufficient number of linguists.   This unique labor market gives Arabic language contractors a strong incentive to prevent their employees from leaving and seeking employment with another vendor.

This security clearance system reduces large numbers of employees to the status of indentured servants, because employees cannot quit without being prohibited from employment in any job requiring a security clearance.   The period of indentured servitude lasts until the government issues the clearance.    Once the government issues the clearance, the contractor has no ability to prevent the employee from leaving.    As a result, Titan delays approval of clearances as long as possible.   Employees such as Shallal have no ability to assert any statutory rights.   Employees may not attempt to form a union, complain of discrimination, question workplace safety, or even criticize their own manager, because the government contractor has a license to retaliate against them.

Second, the security clearance system does not provide the employee any notice of the clearance decision or any chance to challenge the denial of the clearance.   Notice of a clearance denial goes to the government contractor.   The contractor is not required to communicate the finding to the employee.  The contractor may challenge the clearance denial, but the individual has no method to challenge the denial.   Indeed, since the employee gets no notice of the decision, the employee does not even know of the denial. Employees who quit will almost never get notice of the denial.   Many contractors place employees on projects not requiring a high clearance level pending the clearance investigation.   If a clearance is denied, the contractor could simply keep the employee in the job not requiring a high level clearance.    Indeed, employees do not even receive notice if their clearance is granted.   Frequently, an employee will get a temporary interim clearance pending a final decision.   Employees with a permanent clearance can command a vastly higher rate of pay.    The government gives the contractor discretion about whether to tell the employee their clearance has been granted.    As a result, a

contractor can reduce their labor costs by falsely telling employee their clearance is still pending even though the clearance has in fact been approved.

The government's system of processing security clearances fails to afford individuals due process, because an individual permanently denied a clearance has no forum to contest the denial and further because the government does not provide the individual any notice.

Shallal has been shut out of his career of choice, because he desires a career in national intelligence, homeland security, and/or Arabic translation.   Nearly all the jobs in this field require a clearance and the best paying jobs require clearances.

There is no doubt that exclusion from his profession is attributable to state action. The database governing security clearances is maintained and owned by the federal government.   The government made a decision to permit contractors to enter nonsensical data into the system and then did not oversee the database to ensure the information is outdated, applicable, or relevant.   Shallal, private sector employers wishing to hire him, and government agencies wishing to hire him have all attempted to remove the hold on his employment, but all of them have failed.

**4E.   False Claims Act**

The Due Process Clause of the Fifth Amendment to the United States Constitution grants plaintiff the right to bring a civil action to enforce his right for notice and an opportunity to be heard; however strict enforcement of the False Claims Act would prevent plaintiff from exercising his constitutional rights.   Where as here the constitution collides with a federal statute, the constitution supersedes the statute, and the court must find the statute is unconstitutional as applied to him under the unique facts of this case.

18

The False Claims Act gives the government the right to take over a case and dismiss an entire complaint. 31 U.S.C. §3730 (c)(2)(a). The government's power to dismiss a complaint would let the government dismiss plaintiff's claims against the government thus preventing plaintiff from enforcing right guaranteed by the Fifth Amendment.

The plaintiff sues the government, because the government has established the security clearance process denies individuals notice and an opportunity to be heard. Shallal sues Titan for breach of contract, because Titan failed to submit his security clearance application to the government. Shallal also asserts a False Claims Act against Titan, because the contractor routinely has employees guess at security clearance questions, makes employees provide false information, and withhold clearance applications from the government. Titan gets employees an interim clearance, but then contrary to its contract with the government the company does not submit the permanent clearance application in a timely manner.

The Department of Justice has a conflict of interest between its duty to defend the government and its duty to pursue over-billing by government contractors. The **False Claims Act** (31 U.S.C. § 3729–3733) allows people who are not affiliated with the government to file actions against federal contractors claiming fraud against the government. The statute's private attorney general provision supplements the power of the Department of Justice to bring their own action.

The government has several options in handing cases. These include:

1) Intervene in one or more counts of the pending qui tam action. This intervention expresses the Government's intention to participate as a plaintiff in

prosecuting that count of the complaint. Fewer than 25% of filed qui tam actions result in an intervention on any count by the Department of Justice.

2) Decline to intervene in one or all counts of the pending qui tam action. If the United States declines to intervene, the relator may prosecute the action on behalf of the United States, but the United States is not a party to the proceedings apart from its right to any recovery. This option is frequently used by relators and their attorneys.

3) Move to dismiss the relator's complaint, either because there is no case, or the case conflicts with significant statutory or policy interests of the United States.

4) Settle the pending qui tam action with the defendant prior to the intervention decision. This usually, but not always, results in a simultaneous intervention and settlement with the Department of Justice (and is included in the 25% intervention rate).

The False Claims Act (§ 3730) therefore gives the Department of Justice the right to dismiss an entire complaint including Shallal's claims as the federal government and federal employees.   Alternatively, the Department of Justice could settle Shalall's claims against Titan as well as the government's claims against Titan.   A settlement agreement containing a confidentiality clause could also plaintiff from obtaining discovery.   The False Claims Act further requires plaintiff to provide the Department with a copy of the complaint and wait until the government decides whether to intervene.   The plaintiff may not serve the complaint until after the Department decides whether to intervene.   The government could delay a decision to intervene until after the statute of limitations on claims against the government, claims against federal employees, and claims against Titan has expired.   Experience teaches that as time elapses witnesses move, documents become lost, and memories fade.   Allowing the government to delay the litigation would

therefore would prevent plaintiff from engaging in discovery until after relevant evidence has evaporated.

Permitting the Department the ability to represent itself against Titan, settle Shallal's claims against Titan, defend itself from Shallal's claims, and the unfettered discretion to dismiss Shallall's claims against the government is a recipe for highly unethical conduct.   The government's own motion to dismiss the False Claims Act case aptly shows the conflict of interest.   Department would like to make the case go away and so the Department asked for dismissal of the False Claims Act claims against Titan. However, dismissing the False Claims Act claims against Titan would prevent the government from recover for over-billing by Titan.

The conflict exists between the False Claims Act and plaintiff's constitutional rights, and the conflict should be rectified precluding enforcement of some provisions of the False Claims Act.   The court could also require the Department to appoint outside counsel to represent the government on the False Claims Act case or fashion some other remedy.   The court could also stay the False Claims Act claim, while allowing the other counts to proceed.   The order staying the case could be conditioned on the government's agreement to abstain from using its powers under the False Claims Act to dismiss or settle Shallal's claims against the government or Shallal's non-False Claims Act counts. Plaintiff opposes staying the False Claim Act claim, but he would prefer this remedy to dismissing the claim.   Until the court devises a mechanism to remedy the conflict, the court should not dismiss the False Claims Act claim.   Finally, if the court does dismiss the False Claims Act claim, the dismissal should be without prejudice.

**5.  Conclusion**

**Plaintiff asks the court to convert the motion to dismiss into a motion for summary judgment and deny the motion based upon an incredibly critical factual dispute going to the heart of the case.**    Alternatively, the court should simply deny the government's motion to dismiss.

_____

Michael Beattie

2663 Manhattan Place Suite 106

Vienna, VA 22180

703-698-0623

antiwarattorney@yahoo.com

**DEFENSE SECURITY SERVICE**
DEFENSE INDUSTRIAL SECURITY CLEARANCE OFFICE
2780 AIRPORT DRIVE, SUITE 400
COLUMBUS, OH 43219-2268

MAY 0 9 2006

Mr. Manhal Sabah Shallal
13971 Coldwater Drive
Sterling Hts, MI 48313

Dear Mr. Shallal:

Reference your letter received May 8, 2006 wherein you requested the reason that your interim eligibility was withdrawn.

Due to information developed during the course of your investigation your interim eligibility was withdrawn.

Please be assured that a final eligibility determination will be made as quickly as possible after your investigation is completed and your Facility Security Officer (FSO) will be notified accordingly.

We suggest that you keep in contact with your FSO and address any questions or concerns you may have regarding your application to that office.

Sincerely,

DENNIS G. MOCHERMAN, CPL
Chief, Customer Service Division
Office of the Chief Information Officer

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| Mark Shallal, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:07-cv-2154 (RMC) |
| | ) | |
| Robert Gates, Francis Harvey, | ) | |
| L-3 Communications (Titan Group), | ) | |
| | ) | |
| Defendants. | ) | |

<u>ORDER</u>

Upon consideration of plaintiff's Opposition to Motion to Dismiss, and of the

entire record, and it appearing to the Court that the granting of plaintiff's motion, would

be just and proper, it is by the Court this ___ day of _____ , 2008

ORDERED that Federal Defendant's Motion to Dismiss be, and it is, denied.

_____
UNITED STATES DISTRICT JUDGE

Copies to:


Michael J. Beattie
2663 Manhattan Place
Suite 106
Vienna, VA 22180
(703) 698-0623
Email: antiwarattorney@yahoo.com

Brian Christopher Baldrate
U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
555 Fourth Street, NW
Washington, DC 20530
(202) 353-9895
Email: brian.baldrate@usdoj.gov

Michael J. Murphy
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
2400 N Street, NW
Fifth Floor
Washington, DC 20037-1153
(202) 887-0855
Fax: (202) 887-0866
Email: michael.murphy@odnss.com