UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                          )
**MARK SHALLAL,**                         )
**Plaintiff,**                            )
                                          )
v.                                        )   Civil Action No. 07-2154 (RCL)
                                          )
**ROBERT GATES,**                         )
**Secretary of Defense,** *et. al.*,      )
                                          )
**Defendants.**                           )
_____

**<u>Response to L-3 (Titan) Unopposed Motion for More Definite Statements by Mark Shallal</u>**

<u>INTRODUCTION</u>

On February 6, 2008, defendant L-3 Communications (Titan Group) filed a F.R.Civ.P. 12(e) unopposed motion, moving the Court to order plaintiff Shallal to file a more definite statement of his claims set forth in Counts I though VII of his complaint. [Docket # 6]. In the memorandum filed in support of its motion Titan claims that the Counts are supported by "overly vague and ambiguous allegations lacking in specificity, depriving Titan of its basic right to have fair notice of the allegations against it in order to prepare a responsive pleading or otherwise move." [Titan's Motion at 3]. The clarifications were primarily requested in the allegations of Fraud. On July 23, 2008 this Court ordered Shallal to respond to the motion for more definite statement filed by Titan, and elaborate on certain issues.

Am affidavit by Shallal, supplements and is attached to this document.

<u>ARGUMENT</u>

In its motion for more definite statement, the defendant alleges that fraud was not pled with sufficient particularity per the mandate of F.R.Civ.P.9(b), since "the who, what, when, where, and how" is not presented in the complain. The motion requests clarifications of specific counts of the complaint. These will be addressed in the order that they are presented in the above captioned motion.

Count I, Paragraph 31, contains the following passage:

31. Defendant Titan tricked Shallal into going to Kuwait by "giving of….payments" as the term is used in the Protocol. The defendant perpetrated a "deception" upon plaintiff by telling him he would be a translator in Kuwait when in fact he was being sent to be a spy Iraq.

The protocol referred to in the above paragraph is the Protocol to Prevent, Suppress and Punish Trafficking in persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime, Article 3(a).

http://www.uncjin.org/Documents/Conventions/dcatoc/final_documents_2/convention_%20traff_eng.pdf .

The attached affidavit outlines the particulars surrounding the fraud that was committed, and how Shallal was tricked into going to Kuwait, without knowing that the real purpose of the trip was to move into Iraq.

On February 15, 2003 Mark Peltier, Titan's linguistic director, said to Shallal that he was only going to work in Kuwait.  This conversation happened in Fairfax, Virginia, and it specifically misled Shallal into believing that he would be assigned duties in Kuwait. [Affidavit at 1]. Considering that Shallal was not requested or required to perform his duties as a Translator in Kuwait, in any meaningful capacity, it is fair to assume that the original purpose of hiring Shallal was to exploit his language skills in Iraq.  Further, considering that Shallal filled out his security questionaire, and for all purposes was on staff of Titan.

Peltier, his supervisor, knew Shallal was a Caldean Christian, and as March 2003 was still a citizen of Iraq and was not a U.S. citizen.   Anyone with some familiarity with Iraqi history or culture knows about the historic discrimination and hatred expressed by Muslim toward the Christian communities in Iraq including but not limited to Chaldena Christians.  Shite Muslims regard Chaldeans as a fifth column for Christian crusaders in Iraq, and numerous public statements by the Saddam Hussein has accused Chaldeans of collaborating with foreign powers to divide Iraq and helping foment Kurdish independence.   As a result, the Hussein regime implemented an Arabization program to force Chaldeans to assimilate and deported 100,000

Chaledeans from their homes around Baghdad to refuge camps in Northern Iraq. Exhibit 2 provides more information about the mistreatment of Chaldeans. Despite discriminating against Chaldeans many credit the Hussein regime with containing Shite extremism and preventing pogroms against Chaldeans. Prediction about Shite hatred of Chaldeans has been confirmed since the fall of the Baathist regime. Chaldean religious leaders have been methodically gunned down and/or kidnapped.

Prior to leaving for Kuwait, Peltier knew the actual assignment would be to infiltrate Iraq prior to the invasion. Based upon the well known historic revulsion shown by Shites toward Chaldean combined with the view that Chaldeans operated as fifth columnists for crusading Christians, Peltier planned on sending Shallal on a suicide mission. The failure to communicate the real intent behind their trip, constitutes a gross misrepresentation of the most important information about Shallal's actual employment duties. When coupled with Shallal's national origin and faith, and the fact that if this was communicated to him, he would not have agreed to the assignment in the first place, there is an indicia of scienter, and an attempt to force Shallal to go to Iraq, despite his will, through making the Iraq part of the trip known to him at the last minute, when he would psychologically be less able to resist, due to distance to home, and the field authority of his supervisor. [Affidavit at 2]. Further, Titan calculated Shallal's pay based upon a low level security clearance translating in a safe non-combat area. Titan did not have any intention to pay Shallal according to Iraq's labor and employment laws such as paying hazardous duty or overtime premium pay. Titan planned on assigning duties requiring a very high level security clearance and such jobs come with enhanced compensation. Given that Shallal was not a U.S. citizen there was no possibility of him obtaining the security clearances necessary to carry out his mission. By telling, Shallal he would only need a low level clearance, the company deliberately misled him about his duties. Had the United States government known of Shallal's duties and background, the government never would have consented to

placing Shallal on the mission.    Therefore, one can only assume that Peltier or others at Titan misled the government about Shallal.

Count II, breach of contract, is claimed to be similarly deficient. The allegations brought by plaintiff there, stem from a valid and binding contract that Shallal entered into with Titan, which called for timely and accurate submission of security clearance information. As has been illuminated by the present case, Shallal received his security clearance only now, i.e. almost five years later after he applied for it. The people responsible for security clearance processing in Fairfax were Samer Jalad, Chiman Zibari, Abdul Wahab, Muhamad, and an HR lady, whose identity is known only to Titan. [Affidavit at 1 & 2]. While working under the authority vested in them by Titan, they consciously chose to circumvent the security clearance procedures, and in the process have damaged Shallal's chances of switching to another employer. It is logical to assume that they were acting on orders from their superiors, with the intent of keeping Shallal in a state of servitude, and preventing him from finding better working conditions in the future, in his occupation of choice.

Count III, falls under the exception of F.R.Civ.P. 9(b) which provides that if the facts necessary to plead fraud or mistake are peculiarly within the defendant's knowledge, the court may relax the particularity requirement. Considering that Shallal was only a low-level clearance translator, and his indication of numerous violations, and withholdings of information by higher level translators, are clearly spelled out in the attached affidavit, there is a high probability that the overcharging of the government was occurring as well. [Affidavit at 5]. However, the only receptacle of physical evidence of such acts would be Titan corporation and its successors, as well as those individuals who were responsible for billing the government. In light of these difficulties, Shallal respectfully asks this Court to relax the pleading standards, and wait until discovery for proof of these very plausible, albeit theoretic allegations.

The Iraq Labor Code, referenced in Count IV of the complaint, is still in force today, cited by CPA and other Iraqi entities, its located on the internet, and is an official Act No. 71 of 1987. http://www.iraqitic.com/documents/otherLaws/LaborLawNo71.pdf .

Paragraph 8(2) defines 'Employer' as any individual or legal entity who employs one or more workers in return for wages, which clearly encompasses the relationship that Shallal and other workers had with Titan. Paragraph 112 (2)(b) provides that all workers, even uninsured, have a right to payment of wages upon injury for at least one year after the fact. Shallal did not receive the payments, more so, he was treated inhumanely and worse than injured enemy combatants, as detailed in his affidavit. [Affidavit at 7].

Count V, refers to the Convention (IV) relative to the Protection of Civilian Persons in Time of War. Geneva, 12 August 1949. Considering the Shallal lost his employment as a result of commencement of hostilities between the United States and Iraq, he is entitled to relief per the provisions of the above mention Convention.

Count VI is rather self explanatory, in the sense that provision which prevent a citizen of a nation that is unable to press the case for its citizen from doing so on his own behalf, clearly violate the Hague Convention.

Allegation that Count VII, concerning the security clearance application, and its mishandling, does not provide sufficient details have been addressed above, as the same people who were responsible for filing Shallal's application on behalf of Titan, are responsible for its mishandling and the resulting lack of due process that Shallal was forced to undergo.

## CONCLUSION

In light of the clarifications made above, Titan is no longer unable to respond to the allegations in the original complaint. Therefore consideration of the complaint with this motion and the accompanying affidavit should be carried out as soon as possible, to prevent the occurrence of further injustice.

                      Respectfully Submitted,

                      __/s/_____
                      Michael J. Beattie
                      2663 Manhattan Place Suite 106
                      Vienna, VA 22180
                      703-698-0623 Phone

Case 1:07-cv-02154-RCL   Document 26   Filed 08/03/2008   Page 6 of 6

**November 15th 2002:** Contacted a recruiter for a linguist position with Titan/L-3.
**January 15th 2003:** Titan/L-3 brought me to Fairfax VA for processing.
- The work was at 3877 Fairfax Rd., Fairfax VA 22030
- I/We lived at the Comfort Inn on 29 Freeway, Fairfax VA 22030
- Filled out SF86 on the computer at the Titan/L-3 office with the help of the staff
- I did my finger prints at a local police station
- I did my medical exam
- Since I was a Green Card holder at the time, they said that there was no position for me so I had to wait at the office

**February 15th 2003:** Marc Peltier Titan's linguistics program director, told me that we are going on an assignment to Kuwait, with him, linguist named Manhal Jajika, and Marc's assistant who went by the name of Jason sometimes.
- Titan did not provide me with any details of the job, function, or assignment. I could not ask for details, it was forbidden to ask questions, in fact, we (new recruits who are ready to deploy/work) were isolated in a small "Conference room" on the same floor where HR, Language Program Directors, Recruiters, and Managers cubical. Below is what I/We did on daily basis:
    - Go to the office everyday to sit, wait, and/or;
    - Help other people:
        - Filling out SF86 – SF85 forms
        - Take them to their appointments
        - Recruit new linguists
        - Do administrative work
    - I/We were not allowed to move around freely in the office
    - Did not talk to other people or recruits about our status
    - Did not discuss our current status among each other
    - Do not ask questions
    - The impression was "Wait until we talk to you"
    - I was moved around by the words of people that I did not even know, they did not present themselves openly, and they were untouchable to us. I can identify those people if I see them, I can describe them, but I was not given their names. I only spoke to five about the job:
        - Three people who briefly explained my journey to the middle east and how classified it was and I was going with a small group to interpret and provide language support for Marc Peltier. Among those people;
            - Kevin?? (Tall, white, short haired)
            - Dian?? (average height, white, fairly overweight, short blond haired)
            - Marc Peltier (Short, white, were glasses, tanned)
        - Four people who worked in the recruiting and processing cubical:
            - Samer Jalad
            - Chiman Zibari

- o 'Abdul Wahab??
- o Muhamad
- One HR lady, from the other side of the floor where we were not supposed to go, I only went there to do my benefits before I went to Kuwait

- They said your papers and travel document (Visa la Pase) were ready
- While in Kuwait, we were given two cell phones, and the team shared two computers.  One of each would be for personal communication and the other for new recruits.
- We switched hotels very often, never get in a local car, never gave out real names, never showed ID cards, never talked to people about who we are, called home only on permission and from a local calling centers.
- Person(s) I was with from the company, spoke Arabic, and did not need translators; they needed me for when we are in Iraq
- While in Kuwait I did not translate or interpret a word from Arabic to English or English to Arabic, even the recruits spoke enough English and Arabic to understand the process.
- Held interviews and meetings with new candidates after placing ads in local media for linguist to work for an American company.
- March 1st 2003: I was told that we were going to Basra/Iraq to do recruit locals as linguists and informants for the US.
- I refused for many reasons:
    - I'm not a US citizen, only a Green Card holder
    - I'm entering Iraq illegally
    - Iraqi is my home of origin
    - I got out before my mandatory enlistment date, which makes me a deserter
    - I'm Christian
    - I'm working with the USA in a time of conflict, and possible war between the two countries
    - I'm entering Iraq to recruit Iraqis against their regime

**February 23rd 2003:** I returned home (Michigan), very disappointed and down, because I was hoping to make a career out of my employment and doing something as big and rewarding by working for our Government.

**April 1st 2003:** Worked with a company called "Control Technique, Sterling Heights MI", were we build power supply and electric panels for assembly lines robots.  This job had advantages:
- Cover my expenses
- Can go back to school
- Very close to where I lived

**March 5th 2004:** Was contacted by a recruiter from a company called "SM Consulting, Fairfax, VA", a Government contracting company that was hiring linguists to support a Defense Intelligence Agency contract in Qatar and Iraq.  Facts:
- Facility Security Officer: Christopher Blankenship
- Project Manager: Rick Godfrey
- Owner of SMC: Sheila Hanse
- Titan/L-3 did not release my name from their contract
- My clearance status was not clear to the Security Department of SM Consulting
- SM Consulting submitted me for a Secret Investigation since I was a US Citizen
- SM Consulting submitted me for a Counter Intelligence (CI) Polygraph
- SM Consulting held Arabic Language Proficiency Course which I completed
- SM Consulting held an on-line Counter Intelligence Familiarization Course which I completed

**April 15th 2004:** I was deployed to Qatar, then Iraq to work in "Camp Slayer" in Baghdad near the Baghdad International Airport.  During this period I provided the following:
- Arabic Language specialist for the Defense Intelligence Agency's (DIA), Iraq Survey Group (ISG), and Multi National Forces of Iraq (MNFI) operations.
- Interpretation, monitoring, analyzing, and translation as part of the exploitation process of captured media for intelligence value related to the former regime's WMD Programs, strategic intention, the Coalition's counter-terrorism, and counterinsurgency efforts.
- Draft abstracts of captured documents by intelligence community analysts to be reviewed.  Coordination of meetings with DOD analysts to explain information found in captured documents, to improve exploitation efforts.
- Provide full translation of Arabic and Iraqi classified materials; documents, books, maps, plans, and miscellaneous ID cards.  The documents ranged from one page to full manuals, subjects house hold inventory of collected materials.
- Provide intelligence analysis on captured materials, media, and documents as part of the Military Intelligence effort in cooperation with other federal agencies for special assignments in support of fighting terrorism.
- Succinctly communicate findings to senior contract and government personnel.
- The analysis included the seeking and capturing of many terrorist elements wanted by the coalition forces in Iraq and other parts of Middle Eastern Region
- Responsible for identifying and reporting Priority Intelligence Requirements (PIR) gathered from captured materials.
- Produce written reports as well providing g*ists* (summarization of key points), detailed summaries, and transcripts of the material.
- Preparation of full translation on documents and report, from Arabic to English, and from English to Arabic, at the Central Command office of the US Air Force in Baghdad, Iraq.  Those reports were sent directly from our office to the pentagon on daily basis, for further processing by higher officials in DC.

**July 15th 2004:** Incident:
- Location; MWR facility at Camp Slayer, Baghdad

- Who: Combined Media Processing Center (CMPC) Arabic Exploitation Linguist
- What: sympathetic US contractor to Islamic extremists
- Description of incident:
    - Around 10 people watching TV, news updates from the streets of Baghdad
    - News about one of the first US convoys that got attacked, where we lost 7 US soldiers
    - One of the CMPC linguist of a Moroccan Nationality (Background), jumped up and down once he heard the news stating the following in Arabic; "Allah will victory Islam on the American, like he victored them against the Crusaders in Spain"
    - He said that while turning to us (5 other Arabic linguists from CMPC), four Kurdish, and my self, thinking that we will share the feelings.
    - We panic, and then the Kurdish guys ((Who are Muslims)) said to me; "If you report him we will come with you as witnesses"
    - I did not hesitate, I found a Military Police Officer (MP), and gave him the description then pointed out the person who made the statement
    - Few days later, the person is not at CMPC anymore, thanks to the bravery of those guys who witnessed with me the statement in Arabic.
    - Later specifically on August 15 2007, the same individual is processing at CRC, Ft. Banning, GA.
    - I saw the individual who bunked on the same bed with me in the same barrack
    - On eye contact we immediately recognized each other
    - He disappeared from my sight after that
    - I rushed to Titan/L-3 site manager on post and explained to him everything in the presence of other new hires

**July 15th 2005:** Incident:
- Location: Perfume Palace "Central Command" and US Air Force Headquarters in Camp Slayer, Baghdad
- Who: Combined Media Processing Center (CMPC) Arabic Exploitation Linguists
    - Abubaker Zaid Phone # 517-339-2402; a very good friend of the subject, whose name might be Usman or Usama Said
- What: sympathetic US contractor to Islamic extremists, and terrorists
- Description of incident:
    - During the course of my assignment as an Arabic Linguist
    - Gists and important classified material were extracted from captured data and scanned documents obtained from Terrorist suspects and organizations wanted by the US Government
    - Many of those extracted materials were being disguarded and misdirected by linguist who did second phase of processing in which to submit in reports to authorities and decision makers back home in DC
    - Those linguist who intentionally did not submit, held higher level of access (Clearance) Top Secret
    - It was unacceptable to question the work or contributions of those linguist especially by a step down clearance holders like many other linguists with

- Secret Clearance Only, or Interim Secret
- Those individuals were imams at their work sites, claiming that they were approved by the commanders on post
- They always taught "Islamic teachings" behind closed doors to those of local national hires (Iraqis, Somalis, Egyptians, Sudanese, Lebanese, Moroccan, Algerians, and other nationalities)
- Those foreign and local hire of non US status were later banned from working on US bases for many cases of espionage and sabotage
- Everyone of those Foreign and Local Hires was a former security, maintenance and servants at Saddam's Palaces when he was in power, they were loyal enough to get those jobs at his palaces, which are prohibited to common Iraqis citizens
- When subjects like: not translating everything, hiding information, protecting criminals, and being faithful to the job and our nation arouse among linguist on off-time or work time, many sympathies with those who are not and should be exposed then fired, and among those who sympathies with such Linguist (traitors):
    - Abu Baker Zaid (Sudan)
    - Zina Okaily (Egypt)
    - Usama Shams (Egypt)

**October 1st 2005:** My last day of employment with SM Consulting.

When I spoke with the Director's office for the Industrial Security, I was informed of the following:
You are one step ahead, others who have the same situation like yours because of what Titan did to their clearance, have sent letters to the White House, and we are in the process of reviewing those complaints forwarded to us by the White House. There is no solution to this; "you see, this is a privilege not a right, it is not the Government who is stopping you from getting the clearance and the job, it is the companies" furthermore; "the best thing you do is to find a nice FSO who would be willing to work with you and submit a continuation of investigation on you file!"

**April 26th 2006:** I was offered a permanent position with the National Security Agency, a ladder job, and to me this was everything I have ever dreamt of, to work for the United State Government. But this offer went down the drain as soon as they discovered my clearance status.

**May 9th 2006:** Received a response to my request of why my Interim eligibility was withdrawn. The office suggested that I keep in contact with my FSO. As if I was working for Government Contracting company and would be easy for me to find a nice FSO, who would be willing to work with me as an outsider.

**June 7th 2006:** another request for my current status on the Security Clearance Investigation. The reply was NACLC investigation was completed on March 18th 2005. But there will be no decision until I'm employed again.

Note:  No matter how hard I tried and where I went no company was willing to hire me with this status.  Yet the Government (Defense Security Service/JPASS) was saying that I had no hold or complications of any kind and I can be hired by any company on any contract that requires clearance.

**January 17th 2007:** I requested the status of my Investigation, JPASS showed NACLC was completed and partial investigation by OPM was completed on November 15th 2006.  But it will not go through adjudication for final determination because I no longer had the job.

**April 1st 2007:**  Applied for Arabic Linguist position with "Northrop Grumman Company (NGC), Herndon, VA".

**April 20th 2007:**  NGC informed me that Titan (INSCOM Contract holder) refused to hire me for the Secret position, instead a Non-Clearance position was offered to me.  This CAT I (non-clearance) position means:
- $35,000.00 less in salary than the CAT II (Interim-Secret)
- Fewer benefits
- No chance of upgrading to a higher level of clearance
- Treated as a Non-Citizen, or even Local Iraqi Employees
- Be placed in the most forward jobs, front line among enemy militia with Special Force Units and/or Task Force Units

**May 1-29th 2007:** I was offered a job with the CIA, but this also required a background check, and before initiating an application, they looked up in the system and discovered the denial for the Interim Clearance I had from 2003.

**June 22nd 2007:** I got to Qatar and received my orders/assignment; I was to work with LT. Jaime Schaffer (TLM), Aisha Dozier (Movement Mgr), Anothorny Abner (RM).  My work location was COB Speicher, Point of Contact SGT Lennon.
Site managers; Patrick Lynch, and Jim Walker
I even had a third site manager named Larry Powell

**June 25th 2007:** In Iraq;
- COB Speicher, Baghdad
- Assigned to Aggressive Tactical Unit (OCF-I)
- Do Night Assault Missions on Iraqi Villages/Cities
- Constant confrontation with terrorist groups

**August 1st 2007:** Incident:
- Joey, an 18 years old, local Iraqi hire
- Interpreter who worked with this classified unite for months
- During one mission Joey took a bullet to his shoulder and another one scraped his cheek
- Joey was taken to the hospital on base, but few days after his injury for many reasons

- o He was kept until mission was completed
- o ID card expired, and it is Titan's job to escort him to get a new one
- Combat Hospital said he needs to be flown to Germany or Jordan for treatment
- Instead, Titan tried to send Joey home (outside the base) for treatment
- Joey feared that Titan will fire him, like they did with others
- He asked his Army superiors for help
- He was treated partially, then resumed work many days later, but with a bullet in his shoulder
- One day he was supposed to be taken to the appropriate site for treatment
- Keeping in mind, Joey was awarded letter of appreciation, money, and time off for his heroic act in the battle field few months earlier

**August 22nd 2007:** Incident:
- Few hours after arriving to a site (Night Assault)
- Around 4 am of August 23rd 2007
- I fell in a partially dried canal about 10ft. deep
- Carrying more than 100lb. of gear and supplies on my person
- During that mission, we had several bad incidents and casualties
- I volunteered to carry the gear, ammunitions, and supplies of fallen and injured soldiers
- We walked for many miles, without food or water for couple of days inside enemy controlled villages
- We returned to the base on Saturday 25th 2007
- I woke up with severe pain and lack of movement in many parts of my body
- Went to the unit's medical office thinking this is just another pain we experience when coming back from missions
- I was given anti-inflammatory
- The pain did not go away the next day, I returned to the Medical Unit were I was given prescription to go to the Combat Hospital (CSH) on Monday 27th
- My diagnoses were; possible fractures of ribs 7-9, nerve problem with right leg, injury to mid and lower back
- At CSH, and after X-rays and check up, I was told to take two weeks off of work with minimal or no activities, while doing Physical Therapy (rehab)
- During that period there was no Physical therapists/doctors in Iraq
- The decision was to send me either to Germany or Home for treatment
- I chose to go home, Titan refused
- They kept me captive, it only takes few hours to send someone home, but Titan staff wants me to work at the office or in the hospital for few weeks until they find me a flight home - a lot of none sense
- I was forced to sign two warnings
    - o For not reporting incident; I did report the incident immediately after I got back from CSH with a doctors note, plus we were never instructed to report any incident to the Titan Site Mangers immediately, and even if so, in my case it would have never been possible considering that fact that I got back to the base 2 ½ days after the injury

- For refusing to accept an assignment; I did not refuse to accept the new assignment even though the doctor's restrictions prohibited me from working, and seek rehab. I was available in my tent the whole time. Beside at that time I had been injured for 10 days without any treatment or even pain killers. The other reason why I did not report to the assigned work is because I was misinformed of the date/time, in addition the site managers told me that I was leaving theater in two days
- I was insulted and mistreated under many occasions, I was told many disrespectful things by the site managers and the Titan staff at the office, things like;
    - We own you
    - We will make sure you sign three warnings so you would be fired
    - Take off your cloths right and put on something different right now if you want to fly today which I did but I was not allowed to go
    - All of you guys (linguists) are liars
    - We have seen many like you
- I was forced to wait for extended hours in a very uncomfortable environments for them to give me an answer or to release me to my tent, when I was in severe pain, hungry, and did not sleep for many hours
- Mrs. Rosemary Hahn was the HR person in Baghdad who was responsible of moving me from theater to Michigan
- Titan marked me as ineligible in the WLSE, which means no company will able to send me to Iraq as a linguist in the future
- I have many emails and supporting documents to prove my statements

**During the full course of my employment I have received several awards, performance ratings, honors, and recognitions:**
- Letter of Appreciation, Critical Team Player at the Combined Media Processing Center-Baghdad
- Letter of Appreciation, Employee of the Month from Exxon/Mobil
- Letter of Appreciation from LASON Information Management System
- Certificate of Appreciation CMPC-Baghdad: Camp Slayer for the Listening Post Operation
- Certificate of Appreciation CMPC-Baghdad: Camp Slayer for Iron Horse Exploitation Operation
- Certificate of Appreciation for Recognition of Excellence in Service to the Armed Forces of the United States of America
- Certificate of Appreciation for Support of Task Force Omaha in Iraq
- Certificate of completion for a Proficiency Course in Arabic Language: SM Consulting, VA
- Certificate of completion for a Anti Terrorist Security Familiarization Training: DIA, SM Consulting

The preceding statements are true and correct to the best of my knowledge, which I duly swear and affirm under the laws of the United States.

_____/s/_____
Mark Shallal